k8IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DF INSTITUTE, LLC,
d/b/a KAPLAN PROFESSIONAL,

                              Plaintiff,                    OPINION and ORDER

        v.
                                                           19-cv-452-jdp
DALTON EDUCATION, LLC,

                   Defendant.

        Plaintiff DF Institute, LLC, which goes by the name Kaplan Professional, and defendant Dalton Education, LLC both sell products and services related to test prep for certifications in the finance industry. Kaplan alleges that Dalton persuaded multiple Kaplan employees to come work for Dalton, stealing valuable trade secrets in the process.

        Kaplan originally sued Dalton as well as two former employees, Allison Steers and Cyndee Redfearn, but Kaplan and those employees have since settled all their claims. Dkt. 194 and Dkt. 196. Dalton moves for summary judgment on the remaining claims for misappropriation of trade secrets, conversion, and tortious interference with a contract. Dkt. 154. Dalton also moves to strike Kaplan's damages expert. Dkt. 200.

        The court will grant Dalton's motion for summary judgment in large part. Kaplan hasn't adduced evidence that Dalton ever acquired some of the information at issue, and other information doesn't qualify as a trade secret, so Dalton is entitled to summary judgment on Kaplan's trade secret claims based on that information. The court also concludes that Kaplan's state-law claims fail as a matter of law.

        For the purpose of summary judgment, Dalton doesn't deny that it acquired through improper means trade secrets in Kaplan's December 2018 sales variance report and two

spreadsheets containing information related to Kaplan's business for certified financial analysts. Instead, Dalton seeks summary judgment on the ground that Kaplan hasn't adduced evidence of damages for any misappropriation of that information. The court agrees with Dalton that Kaplan hasn't adduced evidence of unjust enrichment, which is the only theory of damages asserted by Kaplan's expert. But damages aren't an element of a trade secrets claim, so the court can't grant summary judgment on that ground. The court will give both sides an opportunity to explain whether a trial is still needed to resolve the remaining issues. The court will also deny Dalton's motion to strike Kaplan's expert report as moot because Kaplan's theory of damages fails regardless whether the expert's testimony is admissible.

## BACKGROUND

Kaplan sells products and services related to preparation for the examinations for the certifications for certified financial planners (CFP) and certified financial analysts (CFA), as well as for the Financial Industry Regulatory Authority. Kaplan sells books and other study materials for these exams and offers traditional and virtual classroom instruction and self-study programs. Kaplan offers its products and services to both individuals and corporate clients.

Dalton also provides educational products and services for financial planners, including a review course for obtaining a certification. Dalton does not currently sell any CFA products or services, but it is developing a CFA business that it plans to launch soon. Dalton is one of Kaplan's few competitors.

Several of Kaplan's employees chose to leave the company in 2019 and go to work for Dalton, including Cyndee Redfearn (a wealth manager for Kaplan), Allison Steers (an inside sales manager), Jonathan Prebich (an account director), and Mark Sheehan (vice president of

global business development). Dalton hired Prebich as its national account director in February 2019, Steers as a business development manager in March 2019, and Redfearn as a regional account manager in March 2019. Sheehan took a job with Dalton in June 2019, but the parties don't say what the position was. Kaplan alleges that all four employees shared Kaplan's trade secrets and other confidential information with Dalton.

After Kaplan filed this lawsuit, Dalton hired Stroz Friedberg to conduct interviews and perform a forensic analysis to determine who at Dalton may have received Kaplan materials and what devices those materials may have been stored on. Stroz Friedberg also completed the remediation process and removed all potential Kaplan materials from Dalton's systems. As a result of the investigation, Dalton terminated Steers, Redfearn, and Redfearn's supervisor (Laramie McClurg) for retaining or discussing Kaplan documents.

The court will discuss more facts as they become relevant to the analysis.

ANALYSIS

## A. Trade secret claims

Kaplan doesn't clearly define in its brief or proposed findings of fact what alleged trade secrets are at issue in this case. It identifies six documents in its brief:

1. An email attachment titled "ALL Market Data" that contains two spreadsheets[1]

2. Kaplan's CSS CSM training guide

3. A "30.60.90" day plan

4. A December 2018 financial education sales variance report

---

[1] In its brief, Kaplan refers to the spreadsheets as its "CFA Playbook," but neither the document itself nor the email to which it is attached includes that designation.

5. A February 2019 financial education sales variance report

6. Kaplan's "Sales Cycle"

Dkt. 174, at 26–27. Kaplan also objects to Dalton's contentions that several other types of information don't qualify as trade secrets: (1) customer lists; (2) a customer discount for Vanguard; and (3) presentations that Kaplan made to customers about the Security Industry Essentials certification.

In addition to the information that Kaplan specifically identifies, Kaplan says that it is seeking protection for "[v]arious other documents with sensitive nonpublic information regarding Kaplan Professional's customers, business development strategy, and sales and pricing model." Dkt. 174, at 27. But Kaplan neither identifies what those documents are nor explains why they are entitled to trade secret protection, so Kaplan has forfeited any claims based on information not specifically identified above.

Kaplan asserts claims for misappropriation of trade secrets under both state and federal law. *See* 18 U.S.C. § 1836 and § 1839; Wis. Stat. § 134.90. The parties treat the standards governing the federal and state claim as identical, so the court will do the same. There are two basic elements of a claim: (1) the defendant acquired, used, or disclosed the information through improper means; and (2) the information at issue qualifies as a trade secret. 18 U.S.C. § 1639(5); Wis. Stat. § 134.90(2). Dalton advances arguments under both elements and also contends that Kaplan can't prove any damages.

### 1. Did Dalton acquire or use the information?

In its opening brief, Dalton contends that all of Kaplan's trade secrets claims fail because Kaplan hasn't shown that Dalton used any of the alleged trade secrets. But the trade secrets law is written in the disjunctive, so either use *or* acquisition can violate the law. In its

reply brief, Dalton abandons its original argument and contends instead that Kaplan's lack of evidence on use shows that Kaplan can't prove damages. That's a different issue, which the court will consider later in this opinion.

Dalton contends that it didn't use *or* acquire three of the nine documents listed above: (1) the CSS CSM training guide; (2) the "30.60.90" plan; and (3) the February 2019 sales variance report. Kaplan cites evidence that Steers downloaded these documents, but it doesn't cite evidence that she ever gave them to Dalton or that Dalton otherwise obtained these documents. *See* Dkt. 187, ¶¶ 56–57. And a forensic examination of Dalton's information systems uncovered no evidence of these documents. A plaintiff can't rely on speculation at the summary judgment stage. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003). So the court will grant Dalton's motion to dismiss Kaplan's trade secrets claims based on these documents.

**2.   Is the information a trade secret?**

Information qualifies as a trade secret if it meets two criteria: (1) it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) it is the subject of efforts to maintain its secrecy that are reasonable under the circumstances. 18 U.S.C. § 1839(3); Wis. Stat. § 134.90(c). Dalton doesn't deny that that the "All Market Data" spreadsheets or the December 2018 sales variance report meet both criteria, so the court won't consider those documents in this section. But Dalton contends that the "Sales Cycle" document, Kaplan's customer lists, the Vanguard customer discount, and the presentations for the Security Industry Essentials certification don't qualify as trade secrets under one or both of the above elements.

### a. Kaplan's "Sales Cycle"

Kaplan says almost nothing about this document in its summary judgment brief. Kaplan's only description is a single sentence, contending that the "Sales Cycle" includes "sensitive nonpublic information regarding Kaplan's process for identifying and developing its business-to-business sales opportunities, from the inception of the relationship to closing a sale." Dkt. 174, at 27. Kaplan cites no testimony explaining in any detail what the document is, what specific information is secret, or why the information is valuable. The document itself is simply attached to a declaration filed by one of Kaplan's lawyers, Dkt. 170-4, who doesn't have the foundation to explain the importance of the document. *See Nw. Nat. Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994) (affirming decision to strike lawyer's affidavit not based on personal knowledge).

Courts often observe that summary judgment requires the party with the burden of proof to "put up or shut up," pointing to evidence from which a reasonable jury could find in its favor of each element of its claim. *See, e.g.*, *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). In the context of a trade secrets claim, it is not enough to claim that documents fall into broad categories of confidential information. *Weather Shield Mfg., Inc. v. Drost*, No. 17-cv-294-jdp, 2018 WL 3824150, at *2 (W.D. Wis. Aug. 10, 2018). Rather, the party claiming trade secrets protection must identify the specific information alleged to be a trade secret, and then show that the identified information is valuable because it is not generally known and cannot be readily ascertained by proper means. *See IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002). Kaplan has failed to do this for the Sales Cycle document, so the court will dismiss the trade secrets claim based on that document.

### b. Customer lists

The argument section of Kaplan's brief doesn't include a discussion of any particular customer list, but it is undisputed that some of the information that Kaplan obtained included lists of Kaplan's corporate accounts.

Customer lists are not categorically excluded from the definition of trade secrets, but they often fail to qualify when the target market is broad or the identity of customers can be readily obtained by other means. *See Share Corp. v. Momar Inc.*, No. 10-CV-109, 2011 WL 284273, at *9 (E.D. Wis. Jan. 26, 2011) ("Bare bones listings of customer information, such as names, addresses, phone numbers, and contact persons, have been routinely rejected by the Wisconsin courts as constituting a trade secret.").[2] In the relatively few cases in which courts have found that a customer list may be a protected trade secret, courts have observed that the list included only a small group of uniquely receptive customers. *See, e.g., Am. Family Mut. Ins. Co. v. Roth*, 485 F.3d 930, 933–34 (7th Cir. 2007); *1st Rate Mortg. Corp. v. Vision Mortg. Servs. Corp.*, No. 09-C-471, 2011 WL 666088, at *5 (E.D. Wis. Feb. 15, 2011).

In this case, Kaplan doesn't contend, much less cite evidence, that its customers couldn't be readily identified through other means. Rather, it is undisputed that "[t]he financial services companies that Kaplan and Dalton compete for—e.g., companies like Charles Schwab, Merrill Lynch, Morgan Stanley, and Edward Jones—are part of a well-known and recognized

---

[2] *See, e.g., Nalco Chem. Co. v. Hydro Techs., Inc.*, 984 F.2d 801, 804 (7th Cir. 1993); *Sanimax LLC v. Blue Honey Bio-Fuels, Inc.*, 2020 WI App 41, ¶ 27, 945 N.W.2d 366 (nonprecedential); *Burbank Grease Servs., LLC v. Sokolowski*, 2005 WI App 28, ¶ 18, 278 Wis. 2d 698, 712, 693 N.W.2d 89, 96, *rev'd on other grounds*, 2006 WI 103, ¶ 18, 294 Wis. 2d 274, 717 N.W.2d 781; *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis.2d 202, 211–12, 216, 267 N.W.2d 242 (1978).

customer base." Dkt. 187, ¶ 4. So the court will dismiss Kaplan's claim based on misappropriation of its customer lists.

### c.  Customer discount for Vanguard

Redfearn disclosed to her supervisor the discounts that Kaplan offered to Vanguard for individuals and groups of more than 75. Dkt. 189, ¶ 150. Generally, information about pricing qualifies as a trade secret "only when prices are based on complicated or unique formulas that the customers do not know about, or when the customers sign a contract prohibiting them from disclosing the price." *Weather Shield Mfg., Inc. v. Drost*, No. 17-cv-294-jdp, 2018 WL 3824150, at *2 (W.D. Wis. Aug. 10, 2018) (citing *Burbank*, 2005 WI App 28, ¶ 22); *see also Square D Co. v. Van Handel*, No. 04-C-775, 2005 WL 2076720, at *7 (E.D. Wis. Aug. 25, 2005) ("Although the Wisconsin Supreme Court has held that a customer list can constitute a trade secret under the Uniform Trade Secrets Act, no Wisconsin court has held that a price list is entitled to such protection." (citation omitted)). A customer discount is not "complex," and Kaplan doesn't cite evidence that Vanguard was prohibited from disclosing its discount. So the court will grant defendants' summary judgment motion on this trade secrets claim.

### d.  Presentations that Kaplan made to customers about the Security Industry Essentials certification

Jonathan Prebich was an account director for Kaplan until February 2019, when he became Dalton's national account director. In March 2019, Prebich sent Dalton four presentations related to Kaplan's study prep materials for the Security Industry Essentials (SIE) certification. As with the Sales Cycle document, no Kaplan witness describes the presentations or identifies specific information contained in them that would qualify for trade-secret protection. Instead, Kaplan simply attached the presentations to a declaration of one of its

attorneys. *See* Dkt. 167-13. "It is [Kaplan's] responsibility, not the court's, to pin down the specific information that [Kaplan] considers a trade secret." *Weather Shield*, 2018 WL 3824150, at *2. In any event, Kaplan doesn't dispute Dalton's proposed finding of fact that the presentations "were shared with customers and other third parties without any confidentiality restrictions imposed by Kaplan." Dkt. 187, ¶ 88. Information doesn't qualify as a trade secret if it's disclosed to third parties without an express or implied confidentiality agreement. *See Fail-Safe, LLC v. A.O. Smith Corp.*, 674 F.3d 889, 893–94 (7th Cir. 2012); *Centrifugal Acquisition Corp. v. Moon*, 849 F. Supp. 2d 814, 833 (E.D. Wis. 2012). In the case that Kaplan cites, the plaintiff had required the customer to sign a nondisclosure agreement. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1136 (N.D. Ill. 2019).

The court will grant defendants' summary judgment motion on this claim.

### e.  Combination of information

Kaplan contends that the above information is protected when "[t]aken as a whole," even if the documents aren't protected individually. Dkt. 174, at 29. It cites *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001), which held that a "trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." It contends that the "documents and information effectively set out a roadmap for Dalton to attempt to replicate Kaplan Professional's successful business model based on Kaplan Professional's internal, nonpublic information." Dkt. 174, at 29.

This argument fails. "Even under *3M* plaintiffs must still point to something about their [asserted trade secrets], in whole or in part, that make them different from [information] that

9

[is] publicly available. Plaintiffs cannot escape their burden of proof with a conclusory statement that 'everything' is a trade secret." *Vojdani v. Kellerman*, 10-cv-37-bbc, slip op., at 2 (W.D. Wis. Jan. 11, 2011). In this case, Kaplan doesn't explain how its Sales Cycle document, its customer lists, the Vanguard discount, and the customer presentations work together to create a "roadmap" for replicating Kaplan's business. So the court will grant Dalton's summary motion on this claim.

### 3. Damages

The court has concluded that much of the information identified by Kaplan can't serve as the basis of a claim for trade secret misappropriation, with two exceptions: (1) the "All Market Data" spreadsheets; and (2) the December 2018 sales variance report. Defendants contend that they are entitled to summary judgment on those claims too because Kaplan hasn't adduced any evidence of unjust enrichment, which is Kaplan's only theory of damages.[3]

Proof of monetary damages isn't an element of a trade secrets misappropriation claim. As discussed above, a trade secrets claim has two elements: (1) the defendant acquired, used, or disclosed the plaintiff's information through improper means; and (2) the information at issue qualifies as a trade secret. 18 U.S.C. § 1639(5); Wis. Stat. § 134.90(2). So the court cannot grant summary judgment to Dalton simply because Kaplan can't prove damages. But a court may consider whether a party is entitled to summary judgment on specific issues,

---

[3] In a footnote, Kaplan says that it "may" be entitled to a reasonable royalty if it can't prove unjust enrichment. Dkt. 174, at 37 n.5. But unjust enrichment is the only theory of damages asserted by Kaplan's damages expert, *see* Dkt. 149, so Kaplan has forfeited any reliance on a reasonable royalty theory. *See Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 882 (E.D. Wis. 2010) (refusing to consider theory of damages based on reasonable royalty when raised for the first time in a footnote in a summary judgment brief). *See also Moriarty ex rel. Local Union No. 727 v. Svec*, 429 F.3d 710, 722 (7th Cir. 2005) ("A footnote does not preserve an issue for review.").

including damages, *see*, Fed. R. Civ. P. 56(g), so this is still an appropriate issue to resolve before trial.

The key dispute between the parties is legal: does a plaintiff seeking to recover damages for unjust enrichment in a trade secrets case have to show that the defendant used the trade secret to obtain a tangible benefit? Kaplan says that unjust enrichment may be measured by what it would have cost the defendant to independently develop the trade secret, regardless whether the defendant obtains a benefit from the secret. Dalton contends that the costs to develop the secret aren't relevant unless the defendant obtained a tangible benefit.

Dalton cites several cases in support of its view, including one from the court of appeals and one from this court. In *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 477 (7th Cir. 2009), the court summarized Wisconsin's law on unjust enrichment as follows: "The measure of damages under unjust enrichment is limited to the value of the benefit conferred on the defendant; any costs the plaintiff may have incurred are generally irrelevant. The value of the benefit may be calculated based on the prevailing price of plaintiff's services as long as those services benefited the defendant." Thus, under *Lindquist*, the plaintiff cannot recover under a theory of unjust enrichment unless it shows that the defendant actually benefited from its wrongful conduct. Kaplan contends that *Lindquist* isn't instructive because it "was a common-law unjust enrichment case, not a trade secrets case." Dkt. 174, at 43. But Kaplan doesn't explain why the standard for unjust enrichment should be different for a trade secrets case, and it cites no authority for such a view.

In *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 14-cv-748-wmc, 2016 WL 1466579 (W.D. Wis. Apr. 14, 2016) (*Epic I*), a trades secrets case, the plaintiff measured its damages for unjust enrichment "by using [the plaintiff's] cost of researching and developing the

confidential information, including trade secrets, as a 'proxy' for [the defendant's] avoided research and development costs." *Id.* at *2. The court concluded that "the complete lack of evidence tying the costs of [the plaintiff's] research and development efforts to any commensurate benefit to [the defendant's] dooms its methodology." *Id.* In other words, *Epic I* holds that the plaintiff must prove that the defendant benefited from the trade secrets.

Kaplan points to a later decision in the same case, in which the court stated, "there is no basis for requiring [the plaintiff] to show that [the defendant] was ultimately successful in its use of Epic's confidential information and trade secrets (i.e., that such use was profitable)." *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 14-cv-748-wmc, 2017 WL 4357993, at *5 (W.D. Wis. Sept. 29, 2017) (*Epic II*). But Dalton isn't contending that Kaplan must show that Dalton actually derived additional profit from the information. In *Epic II*, the court adhered to its view that under an unjust enrichment theory the plaintiff must show that the defendant obtained a benefit from the misappropriated of trade secrets. The court allowed the plaintiff to present evidence that the defendant had obtained such a benefit by using the plaintiff's confidential information to develop a competing product. *Id.* So neither *Epic* decision supports Kaplan's position that its development costs are an appropriate measure of damages even in the absence of evidence that Dalton obtained any benefit from the alleged trade secret.

In fact, Kaplan cites no authority that supports its view. Kaplan cites *Grove US LLC v. Sany Am. Inc.*, No. 13-C-677, 2019 WL 969814, at *2 (E.D. Wis. Feb. 28, 2019), as a case that allowed the plaintiff to present evidence about its research and development costs to support a claim for unjust enrichment. But *Grove* isn't helpful to Kaplan because the court also held that the plaintiff must show that the defendant "put the idea to a commercial use." *Id.* The other cases Kaplan cites similarly state that a plaintiff's research and development costs

may be relevant, but none of them excused the plaintiff from the basic requirement to show that the defendant obtained a benefit. *3M*, 259 F.3d at 607; *Miller UK Ltd. v. Caterpillar, Inc.*, No. 10-CV-03770, 2015 WL 10818831, at *13 (N.D. Ill. Nov. 1, 2015). *See also Epic*, 2016 WL 1466579, at *5 ("Even those few cases [the plaintiff's] counsel was able to find that allowed a plaintiff to recover savings in research, development and marketing by looking to the plaintiff's original costs, did so based on proof that the savings were actually enjoyed by the defendant."). The court will follow *Lindquist* and *Epic* and consider whether Kaplan has adduced evidence that Dalton benefited from the sales variance report or the All Market Data spreadsheets.

### a. December 2018 financial education sales variance report

One of the Kaplan documents that Steers downloaded was the December 2018 sales variance report, which identifies customer accounts, year-to-date revenue amounts, the products sold to those accounts, the year-over-year change in sales to those accounts, and the account representatives for each account. In May 2019, Steers took information from that report and included it in a spreadsheet she created for Dalton. Specifically, the spreadsheet includes historical revenue data for 25 of Kaplan's corporate clients. Dkt. 151, ¶ 33. Steers shared the spreadsheet with her supervisor, Laramie McClurg. *Id.* In June 2019, McClurg included a hyperlink to the spreadsheet in an email to Joe Gillice (Dalton's president) and Daniel Schoepf (a consultant) under a heading for "Sales Strategy," Dkt. 189, ¶ 143.[4] But

---

[4] Kaplan also cites an email from Gillice to McClurg that they should send the spreadsheet to "Leeds Equity Partners," Dkt. 189, ¶ 145, the private equity firm that owns Dalton. But Kaplan cites no evidence that the spreadsheet was in fact shared with Leeds.

neither side cites any evidence that Dalton ever relied on the figures from the 2018 report for any reason, or that Dalton otherwise benefited from the information.

Kaplan says, "[j]ust as in *Epic II*, Kaplan has provided clear evidence that Defendants used Kaplan's trade secrets to, among other things, create a document that was then used to compare Kaplan's performance with Dalton's." Dkt. 174, at 42–43. To support that conclusion, Kaplan relies on the above facts involving Steers's decision to include Kaplan customer revenue data in a larger spreadsheet. Those facts bear no resemblance to *Epic*, which included evidence that the defendant had used the plaintiff's confidential information to develop a new product. Kaplan doesn't explain how Dalton benefited from the account information it obtained from the sales variance report, so Kaplan isn't entitled to damages for any misappropriation of the report.

### b.  "All Market Data" spreadsheets

Mark Sheehan was Kaplan's vice president of global business development until June 2019, when he went to work for Dalton. In January 2019, Sheehan forwarded an internal Kaplan email chain to James Dalton.[5] Attached to the email chain were two spreadsheets called "ALL Market Data as of 01-09-19.xlsx" that totaled almost 2,000 pages. Dkt. 170-14. The spreadsheets were developed by Kaplan at Sheehan's request at the end of 2018 as a "self-evaluation of Kaplan's sales performance in the CFA industry across all markets over a three-year period." Dkt. 189, ¶ 73. The spreadsheets contain Kaplan's "data on client accounts,

---

[5] Sheehan says that he intended to send the email to a Kaplan colleague named James, but he "inadvertently" sent the email to James Dalton, a long-time friend of Sheehan's, as the result of the email program's auto-complete function. Dkt. 189, ¶ 76.

including specific market data and product sales data, and pricing information broken down by individual clients." *Id.*, ¶ 74. They also identify

> geographic locations where Kaplan Professional has market saturation and locations where it does not, the marketing channels for sales by region in great detail, as well as which products sell best in each region. It identifies the regions where Kaplan Professional uses distributors to make sales and where Kaplan Professional makes direct sales. It also provides information identifying successful and unsuccessful Kaplan Professional marketing strategies by product and by region, and where Kaplan Professional is increasing or decreasing its marketing and sales efforts by product and by region.

*Id.*, ¶ 75. James Dalton deleted the email with spreadsheets attached on July 1, 2019, shortly after Kaplan informed Sheehan that it was aware of the email. James Dalton says that he doesn't remember receiving the email, that he never shared the email or discussed it, that he never used the information, and that he deleted the email without opening it. Dkt. 115, ¶¶ 7–8.

Kaplan expresses extreme outrage that the spreadsheets were sent to its competitor's president. But Kaplan has adduced no evidence that James Dalton shared the spreadsheets with anyone at Dalton or that Dalton benefited from the spreadsheets in any way. Kaplan argues that a jury could infer a benefit from "the similarity of the product offerings—including, among other things, Dalton's development of a competing CFA business and Dalton's express plans to grow by taking Kaplan Professional clients."  Dkt. 174, at 39–40 (internal quotations and alterations omitted). This argument fails. It is undisputed that Dalton doesn't currently sell any CFA products or services. Although Dalton is developing a CFA business, Kaplan doesn't identify any similarities between its CFA products and services and any CFA product or service that Dalton plans to sell. And Kaplan doesn't explain how Dalton *could* use the spreadsheets to develop a similar product. As for taking Kaplan's clients, Kaplan doesn't

identify any clients that Dalton has taken from Kaplan since Sheehan sent the spreadsheets to Dalton. In fact, Kaplan doesn't identify any clients that Dalton even attempted to take as a result of information in the spreadsheets.

Kaplan may mean to contend that Dalton might try to use the information in the spreadsheets to steal clients in the future. But "the mere threat of use is better addressed through an injunction" than through damages. *Epic*, 2016 WL 1466579 (citing *3M*, 259 F.3d at 605). In any event, it's undisputed that all Kaplan documents have been removed from Dalton's systems, and Kaplan doesn't allege that Dalton has access to the information now.

So Dalton is entitled to summary judgment on the question whether Kaplan may recover compensatory damages for any misappropriation of trade secrets. This conclusion moots Dalton's motion that the report of Kaplan's damages expert doesn't satisfy the requirements of Federal Rule of Evidence 702.

## B. Common-law claims

Kaplan also asserts two comon-law claims against Dalton: (1) conversion; and (2) tortious interference with a contract. Specifically, Kaplan says that Dalton committed the tort of conversion when it "intentionally and without authorization took control of Kaplan Professional's confidential, proprietary, and trade secrets information." Dkt. 1, ¶ 170. And it says that Dalton interfered with its employment agreements with Steers and Redfearn by inducing them "to leave Kaplan Professional and join Dalton, . . . to solicit Kaplan Professional's clients and . . . take Kaplan Professional's trade secret information for use at Dalton." *Id.*, ¶ 175–76. Dalton seeks summary judgment on both claims.

### 1. Preemption

Dalton's first argument applies to both conversion and tortious interference. It says that both claims are barred under Wis. Stat. § 134.90(6), which "displaces conflicting tort law, restitutionary law and any other law of this state providing a civil remedy for misappropriation of a trade secret." But § 134.90(6) has limited application in this case. To begin with, trade secrets are not the basis for Kaplan's claim that Dalton interfered with employment agreements by hiring Steers and Redfearn or by using Steers or Redfearn to solicit Kaplan's clients. Also, § 134.90(6) leaves "available all other types of civil actions that do not depend on information that meets the statutory definition of a 'trade secret.'" *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 33, 294 Wis.2d 274, 717 N.W.2d 781 (2006). The court has concluded that most of the information at issue in this case is not a trade secret, so § 134.90(6) doesn't apply to other tort claims based on alleged misuse of that information.[6] And the court need not determine whether § 134.90(6) bars any claims based on misuse of the December 2018 report or the All Market Data spreadsheets because those claims fail for other reasons.

### 2. Conversion

Conversion has three elements: (1) the defendant intentionally controlled or took property belonging to another; (2) the defendant didn't have the owner's consent, (3) the defendant's conduct resulted in serious interference with the rights of the owner to possess the property. *H.A. Friend & Co. v. Prof'l Stationery, Inc.*, 2006 WI App 141, ¶ 11, 294 Wis. 2d 754,

---

[6] In its reply brief, Dalton contends for the first time that Kaplan was required to plead its common law tort claims in the alternative to its trade secrets claims to avoid preemption under § 134.90(6), and that Kaplan's complaint doesn't meet the requirements for pleading a claim in the alternative. Dkt. 188, at 32. But Dalton forfeited that contention by failing to raise it in its opening brief. *See Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005).

763, 720 N.W.2d 96, 100. This court has held on multiple occasions that a common law action for conversion under Wisconsin law is limited to tangible property and doesn't extend to electronic documents like those at issue in this case. *See Epic*, 2016 WL 4033276, at *27; *Rigsby v. Am. Family Mut. Ins. Co*., No. 14-cv-23-bbc, 2014 WL 1515493, at *7 (W.D. Wis. Apr. 17, 2014). Kaplan cites no Wisconsin authority undermining that conclusion, so the court will dismiss Kaplan's conversion claim.

### 3. Tortious interference

A tortious interference claim has five elements: (1) the plaintiff had a contract or a prospective contractual relationship with a third party; (2) the defendant interfered with that relationship; (3) the interference by the defendant was intentional; (4) there is a causal connection between the interference and damages; and (5) the defendant's interference wasn't justified or privileged. *Manitowoc Co., Inc. v. Lanning*, 2018 WI 6, ¶ 40, 379 Wis. 2d 189, 211, 906 N.W.2d 130, 140.

Kaplan contends that Dalton interfered with what Kaplan calls its "Confidentiality and Restriction Agreement," which both Steers and Redfearn signed. Kaplan points to provisions in the agreement related to disclosure of confidential information, soliciting other employees, and otherwise interfering with Kaplan's business relations:

**<u>Confidentiality</u>**

> . . .

> You agree that you shall not disclose Kaplan Professional Confidential Information to anyone who is not specifically authorized to receive it, including other employees within Kaplan Professional, and that you will use Kaplan Professional Confidential Information only for the purposes for which it was given to you. You shall treat Kaplan Professional Confidential Information as strictly confidential and shall use the utmost care to prevent disclosure of Kaplan Professional Confidential

18

Information. In addition, if your employment with Kaplan Professional is terminated for any reason, you agree that you shall not disclose or use any of the Kaplan Professional Confidential Information or portions of it and that you shall return ail Kaplan Professional Confidential Information in your possession to Kaplan Professional.

**Restriction on Post-Employment Activities**

During the term of your employment and for the one year period following the termination of your employment . . . you agree not to engage in any of the following activities . . .:

(i)     you will not hire or otherwise employ any employee of Kaplan Professional (whether full-time or part-lime), or solicit, encourage, or engage in any activity to induce any employee of Kaplan Professional to terminate employment with Kaplan Professional, or to become employed by, or to enter into a business relationship with any other person or entity. For purposes of this agreement, the term employee includes any individual who is an employee of or consultant to Kaplan Professional during the 15-month period prior to your date of termination; or

(ii)    you will not engage in any other activity to interfere with, disrupt or damage Kaplan Professional's relations with any actual or potential client or customer or other[wise] negatively impact the business of Kaplan Professional.

Dkt. 7. Kaplan says that Dalton was aware of these provisions through its past dealings with Kaplan's former employees. Dkt. 189, ¶ 14. Dalton doesn't concede that point, but it doesn't seek summary judgment on the ground that Kaplan doesn't have evidence of intent, so the court won't consider that issue.

As noted above, Kaplan alleges in its complaint that Dalton intentionally interfered with the above agreement by inducing Steers and Redfearn to do three things: (1) leave Kaplan and join Dalton; (2) solicit Kaplan's clients; and (3) take Kaplan's confidential information for use at Dalton.

Kaplan doesn't clearly explain why it believes that Steers and Redfearn violated the agreement by going to work for Dalton. Paragraph (i) under "Restriction on Post-Employment Activities" appears to restrict Kaplan employees from inducing *other* employees from going to work for another company rather than prohibiting the employee herself from taking another job. *See Manitowoc*, 2018 WI 6, at ¶ 26 (construing similar provision as applying only to an employee who "poach[es]" another employee). And paragraph (ii) doesn't expressly prohibit the employee from taking a job with a competitor. Obviously, if Steers and Redfearn didn't have an agreement with Kaplan to refrain from working for Dalton, then Dalton can't be held liable for interfering with an agreement that didn't exist.

If (i) or (ii) is construed as prohibiting an employee from "enter[ing] into a business relationship with any other person or entity" or if simply taking a job with a competitor qualifies as "negatively impact[ing] the business of Kaplan Professional," then those provisions would be invalid under Wisconsin law. Such a far-reaching provision, without any geographic limitation and no limitation on the competitor to which it would apply, would essentially prevent an employee from working in the same field for a year. *See id.* at ¶ 40 (restrictive covenant not enforceable if it doesn't provide a reasonable territorial limit or if it is harsh or oppressive to the employee).[7] So regardless how the agreement is construed, Dalton is entitled to summary judgment on that aspect of the claim.

---

[7] Kaplan contends that Illinois law should apply in light of a choice-of-law provision in the agreement. But Kaplan fails to respond to Dalton's argument that the choice-of-law provision is unenforceable because Illinois law conflicts with Wisconsin policy. *See Beilfuss v. Huffy Corp.*, 2004 WI App 118, ¶ 15, 274 Wis.2d 500, 508–09, 685 N.W.2d 373, 377 (refusing to apply a foreign choice-of-law provision because other state's law governing covenants not to compete differed from Wisconsin's); *Schetter v. Newcomer Funeral Serv. Grp., Inc.*, 191 F. Supp. 3d 959, 961–62 (E.D. Wis. 2016) (same). So Kaplan has forfeited that issue. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results

As for solicitation of Kaplan's clients, the only solicitation that Kaplan identifies is Dalton's attempt to obtain new business from Vanguard in 2019 after Redfearn informed her supervisor what discount Kaplan had offered Vanguard. But it is undisputed that Dalton was unsuccessful in its attempt. Dkt. 187, ¶ 41. So even if Redfearn's actions were a breach of contract and even if Dalton induced Redfearn to take those actions, this aspect of the claim fails because Kaplan suffered no damages. *See Finch v. Southside Lincoln-Mercury, Inc.*, 2004 WI App 110, 274 Wis. 2d 719, 737, 685 N.W.2d 154, 163 (to prevail on tortious interference claim, the plaintiff must prove that there was a causal connection between the interference and damages suffered by the plaintiff).

As for taking Kaplan's confidential information, the court has already concluded that Kaplan hasn't adduced evidence of damages for any misuse of the information from the December 2018 sales variance report and the All Market Data spreadsheet. The same is true for the other information that Dalton obtained through Redfearn and Steers. Kaplan hasn't adduced evidence that it suffered damages because Dalton obtained the Sales Cycle document, customer lists, or presentations. So the court will dismiss Kaplan's tortious interference claim.

## C. Conclusion

The court has determined that Dalton is entitled to summary judgment on most claims and issues, except whether Dalton misappropriated trade secrets in the December 2018 sales variance report and the All Market Data spreadsheets. The question that remains is whether a trial is needed on those issues, and if so, what type of trial it should be.

---

in waiver.").

It isn't clear whether Dalton disputes that it misappropriated information from the 2018 report or the All Market Data spreadsheets. Even if it does, Kaplan has adduced no evidence of damages for either claim, as discussed above. Kaplan says that it wants injunctive relief as well, but it's not clear what form an injunction would take now that all Kaplan documents have been removed from Dalton's systems. In any event, when only injunctive relief is available, that issue is generally resolved through a court trial. *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 648 (7th Cir. 2002) ("If the only relief sought is equitable, such as an injunction or specific performance (a type of affirmative injunction), neither the party seeking that relief nor the party opposing it is entitled to a jury trial."). Perhaps nominal damages are available as well, but going to trial on claims for nominal damages would be a questionable use of resources. So the court will give the parties an opportunity to address these issues. In the meantime, all pretrial deadlines remain in place.

ORDER

IT IS ORDERED that:

1.  Dalton Education, LLC's motion for summary judgment, Dkt. 154, is DENIED on the questions whether Dalton misappropriated trade secrets in Kaplan Professional's December 2018 Sales Variance Report and the All Market Data spreadsheets. The motion is GRANTED in all other respects, including all questions of compensatory damages.

2.  Dalton's motion to exclude the testimony of expert Brian Daniel, Dkt. 200, is DENIED as moot.

3.  The parties may have until August 18, 2020, to file supplemental briefs on whether: (1) a trial is still needed in this case; and (2) if so, whether the case should be tried to the court or before a jury.

Entered August 11, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

23